IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

<table>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>PHILIP DECOHEN,</td><td>*</td><td></td></tr>
<tr><td>    Plaintiff,</td><td>*</td><td></td></tr>
<tr><td>       v.</td><td>*</td><td>CIVIL NO.: WDQ-10-3157</td></tr>
<tr><td>ABBASI, LLC, <em>et al.</em>,</td><td>*</td><td></td></tr>
<tr><td>    Defendants.</td><td>*</td><td></td></tr>
</table>

* * * * * * * * * * * * *

MEMORANDUM OPINION

On September 29, 2010, Philip Decohen, for himself and all
others similarly situated (collectively "the class") sued
defendants Abbasi, LLC d/b/a as Nation Auto of Marlow Heights
("Abbasi"), Capital One, N.A. ("Capital One"), and Beacon
Industries Worldwide, Inc. ("Beacon") for violations of
Maryland's consumer credit contracts laws. ECF No. 2. On
January 10, 2014, the Court preliminarily approved the parties'
class action settlement (the "Settlement Agreement") and the
form, manner, and administration of notice to class members.
ECF No. 78. No class members have objected to the settlement or
opted out. ECF No. 87-1 at 3. Pending are Decohen's unopposed
motions for final settlement approval, approval of the *cy pres*
award, an incentive payment to the Representative Plaintiff, and
an award of attorney's fees and costs. ECF Nos. 87-90. On
April 11, 2014, the Court held a fairness hearing on final

approval of the settlement. ECF No. 93. For the following reasons, Decohen's motions will be granted.

I.    Background[1]

A. Facts

On September 29, 2007, Decohen, a resident of Washington, DC, bought a used Chrysler Pacifica from Abbasi. ECF No. 2 ¶¶ 1, 13. He bought the car for $22,669.16 through a retail installment sale contract (the "Credit Contract"), which included an optional $600.00 Guaranteed Asset Protection Deficiency Waiver Addendum ("the GAP Agreement"). *Id.* ¶¶ 1, 15-16; ECF No. 2-1 at 2. Beacon serviced the GAP Agreement. ECF No. 2 ¶ 1. The Credit Contract was assigned to Capital One, which accepted Decohen's monthly payments. *Id.* ¶ 19.

The Credit Contract stated that it was governed by "Federal law and Maryland law," and was "subject to the Credit Grantor Closed End Credit Provisions (Subtitle 10) of Title 12 of the Commercial Law Article of the Maryland Code." ECF No. 2-1 at 5. It also contained a Holder Notice providing:

> Any Holder of this consumer credit contract is subject
> to all claims and defenses which the debtor could
> assert against the seller of goods or services
> obtained pursuant hereto or with the proceeds hereof.
> Recovery hereunder by the debtor shall not exceed
> amounts paid by the debtor.

---

[1] The facts are taken from the complaint, (ECF No. 2), the joint motion for preliminary approval of the settlement, (ECF No. 80), and their supporting documents.

*Id.*

The GAP Agreement stated:

> The named Customer is responsible to the named
> Dealer/Assignee under the terms of the [Credit
> Contract] for the amount of any early termination
> liability resulting from a Total Loss of the Vehicle.
> Due to this addendum being in effect, the
> Dealer/Assignee agrees to cancel a portion of the
> Customer's indebtedness in the event of a Total Loss
> of the Vehicle as defined herein.
>
> The [GAP Agreement] will pay the amount equal to the
> Unpaid Net Balance less the Actual Cash Value (ACV) of
> the Vehicle both as defined herein.

ECF No. 2-2 at 2.

"Unpaid Net Balance" was defined as "the original 'Amount financed' divided by 'number of payments' multiplied by number of months remaining from the Date of Loss to the final payment due date less all cancelable items refunds." *Id.* at 3. "Actual Cash Value" was "the Customer's Primary Insurance gross settlement, less deductible not exceeding $1,000, or the National Automobile Dealer's Association (N.A.D.A.) official used car guide's 'Retail' value or Kelley Blue Book Guide's 'Retail' value whichever is the Greater." *Id.*

The GAP Agreement also stated that it "may not necessarily pay off the Unpaid Net Balance due by the customer," and that "[a]ll claims calculations" would "strictly adhere to the terms and conditions of [the GAP Agreement] and therefore such

3

calculations may not match or equal the calculation determined by the original lender." *Id.* at 2.

On May 21, 2010, Decohen "suffered a total loss of the Pacifica" and was paid $12,839 by his insurance company. ECF No. 2 ¶¶ 20-21. He then made a claim to cancel the remaining amount owed under the Credit Contract. *Id.* ¶ 22. On August 13, 2010, Beacon denied Decohen's claim because the "Net Unpaid Balance was less than the Actual Cash Value resulting in No GAP being payable."[2] ECF No. 6 at 2.

Because no coverage was provided under the GAP Agreement, Decohen was required to pay the $1,504.29 difference between his insurance payout and the balance actually remaining under the Credit Contract. ECF No. 2. ¶¶ 22-23. He alleged that this would not have happened had he purchased a "true" debt cancellation agreement, as defined by Maryland law, "which cancel[s] the outstanding debt remaining on an account." *See id.* ¶¶ 22-23, 25. He also alleged that Abbasi regularly sold, and Capital One regularly accepted assignment of, "credit contracts financing the sale of phony form GAP Agreements" which

---

[2] Beacon calculated the Pacifica's "Actual Cash Value" to be $13,475--more than Decohen had been paid by his insurance company--because that was the car's N.A.D.A. retail guide value. ECF No. 2-4. The "Unpaid Net Balance" was $12,908.83, based on the original loan balance ($22,669.16) divided by the number of payments (72) multiplied by the number of payments remaining (41). *Id.* Thus, the car's Actual Cash Value was greater than the Unpaid Net Balance.

4

cannot be financed "under Maryland's credit statutes." *Id.* ¶¶ 29-30.

On September 29, 2010, Decohen sued the defendants in the Circuit Court for Baltimore City for violating the Maryland Creditor Grantor Closed End Credit Provisions ("CLEC"),[3] the Maryland Consumer Protection Act ("MCPA"),[4] and the Maryland Retail Installment Sales Act ("RISA"),[5] and for breach of contract, declaratory and injunctive relief, and restitution and unjust enrichment. ECF No. 2.

On November 8, 2010, Capital One removed the case to this Court under the Class Action Fairness Act.[6] ECF No. 1. On July 26, 2011, the Court granted Beacon's and Capital One's motions to dismiss.[7] ECF No. 28. The Court held, *inter alia*, that although the complaint stated a claim under the CLEC, the CLEC

---

[3] Md. Code Ann., Com. Law §§ 12-1001, *et seq.*

[4] Md. Code. Ann., Com. Law §§ 13-101, *et seq.*

[5] Md. Code. Ann., Com. Law §§ 12-601, *et seq.*

[6] 28 U.S.C. §§ 1332(d), 1453.

[7] The Court ordered the dismissal of the claims against Beacon, because it was not a party to the challenged Credit Contract or GAP Agreement, and the allegations failed to state a claim of civil conspiracy against it. ECF No. 28 at 17-18. Decohen did not appeal this dismissal. *See Decohen v. Capital One, N.A.*, 703 F.3d 216, 222 (4th Cir. 2012). Abbasi has not entered an appearance or participated in this case. However, the Settlement Agreement resolves the class's claims against Abbasi in addition to Capital One. *See* ECF No. 93 (fairness hearing).

provisions governing debt cancellation agreements were preempted
by the National Bank Act ("NBA"),[8] which authorizes national
banks to enter into debt cancellation contracts that cancel all
*or part of* a consumer's debt obligation. *Id.* at 10, 13-17. The
Court also held that Decohen had failed to state a claim for
breach of contract. *Id.* at 12-13.

On August 23, 2011, Decohen appealed. ECF No. 35. On
December 26, 2012, the Fourth Circuit Court of Appeals vacated
the Court's order of dismissal and remanded the case. ECF No.
50. The Fourth Circuit held that CLEC provisions governing debt
cancellation agreements were not preempted by the NBA. *See
Decohen*, 703 F.3d at 224-27. The Fourth Circuit also held that-
-because the Credit Contract voluntarily elected to be governed
by the CLEC--allegations that Capital One violated the CLEC
sufficed to state a claim for breach of contract. *See id.* at
227-29.

Following remand, the parties engaged in nine months of
arms-length negotiations and mediation overseen by Magistrate
Judge Susan K. Gauvey.[9] *See* ECF No. 77-1 at 2.

On January 13, 2014, the Court granted the parties' joint
motion for preliminary approval of class action settlement and

---

[8] 12 U.S.C. § 1 *et seq.*

[9] The parties also engaged in informal discovery during the
litigation. ECF No. 77-2 at 3.

for approval of the form, manner, and administration of notice.
ECF No. 78. On February 25 and March 13, 2014, the Court
approved the parties' joint motions for provision of
supplemental notice to additional class members.[10] ECF Nos. 84,
86.

B. Summary of Settlement Agreement

The Settlement Agreement defines the settlement class as
"borrowers in up to 2,027 transactions who financed GAP
Agreements which allow for the use of retail car guides in the
calculation of the vehicle's value, where the borrowers suffered
a total loss of the vehicle." ECF No. 77-1 at 2. The class is
divided into two subclasses: (1) borrowers in transactions in
which there was no remaining loan balance after application of
the GAP Agreement (the "No Balance Subclass"); and (2) borrowers
in transactions in which there was a remaining loan balance
after application of the GAP Agreement (the "Balance
Subclass").[11] *Id.* at 3.

---

[10] The parties moved for court orders to provide supplemental
notice to co-buyers who had been inadvertently omitted from the
original list of class members. *See* ECF Nos. 83, 85.

[11] The class excludes current and former Capital One executives
and their families, borrowers whose loans were not originated in
Maryland, individuals against whom a judgment was granted for
Capital One, individuals granted a discharge in bankruptcy, and
individuals who satisfied their obligations on a car loan more
than six months before the complaint was filed. ECF No. 77-1 at
3.

7

The agreement awards equitable and monetary relief to class members in exchange for Capital One's release from liability. *Id.; see* ECF No. 77-2 at 22-24. Capital One agreed to waive all outstanding balances owed on class members' CLEC contracts and dismiss pending lawsuits related to those balances. ECF No. 77-1 at 3. Capital One also agreed to contact credit reporting agencies to inform them that class members' accounts should be reported as "paid as agreed." *Id.* Finally, Capital One agreed to pay $3,050,000.000 into a Settlement Fund to provide class members a refund of payments made "in excess of the principal amount financed on their automobile installment sale contract[12] . . . less a proportionate share of Class Counsel's attorney's fees and expenses awarded by the Court."[13] *Id.* Those class members in the Balance Subclass "who did not pay in excess of their principal amount financed" would receive $200. *Id.;* ECF No. 87-1 at 6. Each class member in the No Balance Subclass would receive $112, less attorney's fees and costs. ECF No. 87-

---

[12] Upon the parties' joint motion, the Court ordered the addition of $12,400 to the Settlement Fund for the benefit of those persons who were initially miscategorized as members of the No Balance Subclass. ECF Nos. 85 at 2, 86. Class counsel do not seek an attorney's fee award from this additional contribution. ECF No. 85 at 3.

[13] Capital One agreed not to oppose a motion for an attorney's fee award of up to one-third of the Settlement Fund. ECF No. 77-2 at 16. The parties also agreed that class counsel's costs and expenses of litigation would be deducted from the Settlement Fund. *Id*

1 at 6.  Capital One also agreed not to oppose a motion for a
$10,000 incentive payment to Decohen, the Representative
Plaintiff.  ECF No. 77-2 at 22.

The parties agreed to the appointment of Strategic Claims
Services ("SCS") to administer the settlement by providing
notice to class members and distributing the Settlement Fund.
ECF No. 77-1 at 6.  Capital One agreed to provide the name and
last known address of each class member so that SCS could mail
notices of the class action.[14]  ECF No. 77-2 at 20.  It also
agreed to bear the costs of providing notice.  *Id.* at 21.

To share in the settlement, class members who do not opt
out will automatically receive their benefits; they do not need
to submit a claim form.  *Id.* at 4.  Unclaimed monies would be
donated to a *cy pres* fund to be distributed equally to the non-
profits Maryland Consumer Rights Coalition, Civil Justice, Inc.
and Just the Beginning Foundation.[15]  *Id.*

---

[14] If notice is returned because of an incorrect address, the
agreement provides that SCS "will conduct a search using a
competent information broker on the Internet and/or recognized
credit bureau to ensure that" the incorrect address is
"researched and updated with new information . . . and a second
notice sent."  ECF No. 77-2 at 20-21.

[15] "A *cy pres* distribution is designed to be a way for a court to
put any unclaimed settlement funds to their next best
compensation use, e.g., for the aggregate, indirect, prospective
benefit of the class."  *Singleton v. Domino's Pizza, LLC*, CIV.A.
DKC 11-1823, 2013 WL 5506027, at *2 n.2 (D. Md. Oct. 2, 2013)
(*quoting Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 474

On April 4, 2014, Decohen moved for final settlement
approval, approval of the *cy pres* award, approval of an
incentive award to the Representative Plaintiff, and an award of
costs and attorney's fees to class counsel. ECF Nos. 87-90. On
April 11, 2014, the Court held a fairness hearing. ECF No. 93.

II.  Analysis

A. Settlement Class Certification

Under Federal Rule of Civil Procedure 23, to certify a
class action, the class must meet the four Rule 23(a)
prerequisites and fit within one of the three Rule 23(b)
categories. *See Boyd v. Coventry Health Care Inc.*, CIV.A. DKC
09-2661, 2014 WL 359567, at *3 (D. Md. Jan. 31, 2014). The
parties seek certification under Rule 23(b)(3). ECF No. 77-4 at
2.

When parties seek certification for settlement under Rule
23(b)(3), although the "district court need not inquire whether
the case, if tried, would present intractable management
problems" under Rule 23(b)(3)(D), the other Rule 23 requirements
"demand undiluted, even heightened, attention." *Amchem Products,
Inc. v. Windsor*, 521 U.S. 591, 620, 117 S. Ct. 2231, 2248, 138
L. Ed. 2d 689 (1997).

_____

(5th Cir. 2011) (internal quotation marks omitted)).  The Court
will grant class counsel's motion to approve the *cy pres* award.

### 1. Rule 23(a) Prerequisites

Rule 23(a) provides for certification of a class action if:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

#### a. Numerosity

The settlement class consists of more than 2,000 persons. ECF No. 77-1 at 2. As classes with as few as 25 to 30 members "have been found to raise the presumption that joinder would be impracticable," *Stanley v. Cent. Garden & Pet Corp.*, 891 F. Supp. 2d 757, 770 (D. Md. 2012) (internal quotations and punctuation omitted), the numerosity requirement has been met.

#### b. Commonality, Typicality, Adequacy

The commonality, typicality, and adequacy inquiries "are similar and overlapping." *Stanley*, 891 F. Supp. 2d at 770. To establish commonality, the class members must "have suffered the same injury," and "their claims must depend upon a common contention." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551, 180 L. Ed. 2d 374 (2011) (internal quotations omitted). To show typicality, the representative plaintiff "must be part of the class and possess the same interest and suffer the same injury as the class members." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156, 102 S. Ct. 2364, 2370, 72 L. Ed. 2d 740

11

(1982) (internal quotations omitted). Finally, representation is adequate if the representative plaintiff's interests are not opposed to the interests of the other class members, and class counsel are qualified, experienced, and able to conduct the litigation. *Stanley*, 891 F. Supp. 2d at 770.

Here, all members of the proposed class, including the Representative Plaintiff, signed a GAP debt cancellation agreement that used a retail car guide to determine the value of their car in the event of total loss. *See* ECF No. 77-1 at 2. This agreement was allegedly illegal in Maryland because--in many cases--it did not cancel the entire remaining loan balance after a total loss of the financed car. *See* ECF No. 2 ¶¶ 22-23, 25. Although some class members did not have a remaining loan balance after application of their GAP agreements, *see* ECF No. 77-1 at 3, "[f]actual differences among class members will not necessarily preclude certification 'if the class members share the same legal theory.'" *Stanley*, 891 F. Supp. 2d at 770 (*quoting Mitchell-Tracey v. United Gen. Title Ins. Co.*, 237 F.R.D. 551, 557 (D. Md. 2006)). Finally, Decohen's interests are not opposed to the other class members, and class counsel have shown by their vigorous prosecution of this litigation for three and a half years that they are qualified, experienced, and able to conduct the litigation. Accordingly, the Rule 23(a) prerequisites have been met.

2. Rule 23(b) Categories

Rule 23(b)(3) authorizes certification when "questions of
law or fact common to class members predominate over any
questions affecting only individual members, and . . . a class
action is superior to other available methods for fairly and
efficiently adjudicating the controversy." Certification under
Rule 23(b)(3) is appropriate when "settling the parties'
differences in a single proceeding serves their interests by
achieving 'economies of time, effort, and expense' and promoting
uniformity of decisions as to similarly situated class members
without sacrificing fairness." *Mitchell-Tracey*, 237 F.R.D. at
559 (*citing Peoples v. Wendover Funding, Inc.*, 179 F.R.D. 492,
501 (D. Md. 1998); *Windsor*, 521 U.S. at 615, 117 S. Ct. at
138)).

The predominance and superiority requirements ensure that
resolution of the case by class action settlement "achieve[s]
economies of time, effort, and expense, and promote[s] . . .
uniformity of decision as to persons similarly situated, without
sacrificing procedural fairness or bringing about other
undesirable results." *In re Serzone Products Liab. Litig.*, 231
F.R.D. 221, 240 (S.D.W. Va. 2005) (*quoting Windsor*, 521 U.S. at
615, 117 S. Ct. at 2246). To determine if the predominance and
superiority requirements are met for certification of a
settlement class, courts consider:

(A) the class members' interests in individually
controlling the prosecution or defense of separate
actions; (B) the extent and nature of any litigation
concerning the controversy already begun by or against
class members; [and] (C) the desirability or
undesirability of concentrating the litigation of the
claims in the particular forum.

Rule 23(b)(3); *Windsor*, 521 U.S. at 620, 117 S. Ct. at 2248.

Here, although the recovery for each class member will
vary, each class member's claim involves almost identical facts
and the same legal issue, *see supra* Section II.A.1.b, which
indicates the predominance of common questions, *see Gunnells v.
Healthplan Servs., Inc.*, 348 F.3d 417, 428 (4th Cir. 2003)
(noting that, in Rule 23(b)(3) actions, courts usually require
individual proof of each class member's damages and "[w]hen such
individualized inquiries are necessary, if 'common questions
predominate over individual questions as to liability, courts
generally find the predominance standard of Rule 23(b)(3) to be
satisfied'"). Further, resolution of this case through class
action settlement will achieve significant economies for the
parties, the proposed class, and the court. If approval of the
settlement is denied, the class members will have to
individually litigate their claims against Capitol One, which--
given the similarity of the class members' claims--will result
in unnecessarily duplicative litigation and expense for both
sides. Also, given the small amount of many of the class
members' claims--especially those of the No Balance Subclass--

14

denial of the settlement will effectively foreclose relief for most class members as the harm each individual suffered will likely not justify the high costs of individual suits. *See Serzone*, 231 F.R.D at 240-41 (*citing Gunnells*, 348 F.3d at 426) ("Class actions are often the only means for assuring that defendants who have harmed consumers will not benefit from their unlawful conduct simply because of the magnitude of the misconduct and aggregated harm compared to the small magnitude of individual harm."). Finally, there is no indication that any of the class members are pursuing separate litigation on these claims. Thus, the Court will certify the class under Rule 23(b)(3).

B. Final Approval of Settlement Agreement

1. Standard of Review

Before approving a settlement in a certified class action, the court must evaluate its procedural and substantive fairness. *See* Rule 23(e). To ensure procedural fairness, Rule 23(e) requires: (1) court-approved notice to all class members bound by the proposed settlement, (2) a hearing to determine whether the proposal is "fair, reasonable, and adequate," (3) the parties' statement specifying their agreement, and (4) an opportunity for class members to object.[16] *Id.* "The primary

---

[16] The court may refuse approval if a proposed settlement does not allow individual class members to request exclusion, even if

15

concern addressed by Rule 23(e) is the protection of class
members whose rights may not have been given adequate
consideration during the settlement negotiations." *In re Jiffy
Lube Sec. Litig.,* 927 F.2d 155, 158 (4th Cir. 1991).

In Rule 23(b)(3) class actions, "the court must direct to
class members the best notice that is practicable under the
circumstances, including individual notice to all members who
can be identified through reasonable effort." Rule 23(c)(2)(B).
The content of the notice must sufficiently inform class members
of the terms of the proposed settlements and their available
options.[17] *In re MicroStrategy, Inc. Sec. Litig.,* 150 F. Supp.

---

class members had and declined an earlier opportunity for
exclusion. *See* Rule 23(e). This proposed settlement contains
an "opt-out" provision for prospective beneficiaries. ECF No.
77-2 at 24-25.

[17] The notice must state in clear, "easily understood language:"

 (i) the nature of the action; (ii) the definition of
 the class certified; (iii) the class claims, issues,
 or defenses; (iv) that a class member may enter an
 appearance through an attorney if the member so
 desires; (v) that the court will exclude from the
 class any member who requests exclusion; (vi) the time
 and manner for requesting exclusion; and (vii) the
 binding effect of a class judgment on members under
 Rule 23(c)(3).

Rule 23(c)(2)(B). Here, the notice, in clear language,
explained the basis for the suit and the key terms of the
Settlement Agreement including its binding nature, defined the
settlement class, provided the date, time, and place of the
fairness hearing, and discussed the process by which a class
member could enter an appearance at the fairness hearing and
request exclusion from the class. *See* ECF No. 77-3 at 2-3, 5-

16

2d 896, 906 (E.D. Va. 2001) (*quoting Maher v. Zapata Corp.*, 714
F.2d 436, 451 (5th Cir. 1983)).

Courts in the Fourth Circuit engage in a bifurcated
analysis to determine if a settlement is "fair, reasonable, and
adequate" under Rule 23. *See In re MicroStrategy, Inc. Sec.
Litig.*, 148 F. Supp. 2d 654, 663 (E.D. Va. 2001) (*citing Jiffy
Lube,* 927 F.2d at 158-59). To determine if the proposed terms
are fair, the court should consider: "(1) the posture of the
case at the time settlement was proposed, (2) the extent of
discovery that had been conducted, (3) the circumstances
surrounding the negotiations, and (4) the experience of counsel
in the area of class action litigation." *Groves v. Roy G.
Hildreth & Son, Inc.*, 2:08-CV-00820, 2011 WL 4382708, at *4
(S.D.W. Va. Sept. 20, 2011) (*citing Jiffy Lube*, 927 F.2d at
159). To determine if the settlement is adequate, the Court
considers:

> (1) the relative strength of the plaintiffs' case on
> the merits, (2) the existence of any difficulties of
> proof or strong defenses the plaintiffs are likely to
> encounter if the case goes to trial, (3) the
> anticipated duration and expense of additional
> litigation, (4) the solvency of the defendants and the
> likelihood of recovery on a litigated judgment, and
> (5) the degree of opposition to the settlement.

---

12. Accordingly, the notice meets these Rule 23(c)(2)
requirements. *See, e.g., Boyd*, 2014 WL 359567, at *7.

17

*Jiffy Lube*, 927 F.2d at 159; *MicroStrategy*, 148 F. Supp. 2d at 665.

There is a "strong presumption in favor of finding a settlement fair." *Lomascolo v. Parsons Brinkerhoff, Inc.,* 2009 WL 3094955, at *10 (E.D. Va. Sept. 28, 2009) (internal quotation omitted). Because a settlement hearing is not a trial, the court's role is more "balancing of likelihoods rather than an actual determination of the facts and law in passing upon . . . the proposed settlement." *Id.* (*quoting Flinn v. FMC Corp.,* 528 F.2d 1169, 1173 (4th Cir. 1975) (internal quotations omitted)).

2. Fairness Determination

a. Procedural Fairness

As required by Rule 23(e), SCS sent the court-approved "Notice of Pendency of Class Action, Proposed Settlement, and Hearing" to all class members. *See* ECF Nos. 87-1 at 3, 87-3. Notice was mailed to all class members at their last known addresses on file with Capital One. *Id.*; ECF No. 77-2 at 20. If the notice was returned because of an incorrect address, SCS "conduct[ed] a search using a competent information broker on the Internet and/or recognized credit bureau" to determine the individual's correct address and then mailed a second notice. ECF Nos. 77-2 at 20-21, 87-3 at 3. Although the parties identified additional class members after the initial notice was sent, all class members but one were sent a copy of the notice

18

at their home addresses at least one month before the hearing. *See* ECF Nos. 78, 80-81, 85-86.

Under the circumstances of this case, when all class members are known in advance, the Court finds that the method of direct mail notice to each class member's last known address-- and a second notice if the first was returned as undeliverable-- was the best practicable notice. *See, e.g., Grice v. PNC Mortgage Corp. of Am.*, CIV. A. PJM-97-3084, 1998 WL 350581, at *8 (D. Md. May 21, 1998) ("Both the distribution of the notice via first class mail and the thirty-day notice period prior to the final settlement approval hearing permit the class as a whole 'to flush out whatever objections might reasonably be raised to the settlement.'" (*quoting Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993)). Accordingly, the parties have complied with Rule 23(c)(2).

On January 10, 2014, the parties filed the Settlement Agreement and memorandum describing it. ECF No. 77. On April 11, 2014, the Court held a fairness hearing, at which class members had an opportunity to object. No class members appeared at the hearing. Accordingly, as the parties have complied with Rule 23(c)(2) and (e), the proposed settlement meets the procedural requirements for fairness.

b. Substantive Fairness

i. Fairness of Settlement

When the parties began settlement negotiations, litigation
had been ongoing for several years but had not proceeded beyond
the motion to dismiss, and the Court had not considered a motion
to certify the class.[18]  *See* ECF No. 77-2 at 3.  The
Representative Plaintiff had recently obtained a vacatur of the
dismissal of two claims on appeal, which clarified the issues
for summary judgment or trial.  *See* ECF No. 51.  The record
shows that the parties have engaged in informal discovery,
assuring sufficient development of the facts to permit an
accurate assessment of the merits of the case.  *See* ECF No. 77-2
at 3.  There is no indication in the record of bad faith or
collusion in the settlement negotiations; the parties engaged in
court-supervised mediation and represent that the settlement
negotiations were at arms-length.  *See* ECF No. 77-2 at 3-4.

Class counsel have significant litigation and appellate
experience and have been recognized in various national
publications for excellence in their field.  *See* ECF No. 87-4 at
1, 3-5.  Each has served as class counsel in several successful
consumer rights class actions, including class actions involving

---

[18] *See MicroStrategy*, 148 F. Supp. 2d at 664 (finding settlement
fair "although [it] was reached relatively early in the
litigation," because the settling parties had "vigorously
contested a motion to dismiss").

provisions of CLEC. *See id.* at 1-2, 4-6. They have attested to the fairness of the proposal in the Settlement Agreement. ECF No. 77-2 at 4. Accordingly, because class counsel's experience--and the other *Jiffy Lube* factors--weigh in favor of fairness, the Court will find that the settlement is fair.

## ii. Adequacy of Settlement

Although the Representative Plaintiff had on appeal obtained vacatur of the dismissal of two of his claims--which indicates that the claims are relatively strong--neither this Court nor the Fourth Circuit had considered whether the proposed class was certifiable. In the Settlement Agreement, Capital One expressly does not concede the propriety of certification of the class for trial. ECF No. 77-2 at 5. Also, Capital One does not admit its liability and expressly declines to waive any affirmative defenses. *Id.* If the Settlement Agreement is terminated, the parties agree to return to their pre-settlement litigation positions. *Id.* at 25-26. Accordingly, even after three and a half years of litigation, the road to recovery--particularly for the class as a whole--likely would be protracted and costly if the settlement were not approved.[19]

---

[19] *Cf. Serrano v. Sterling Testing Sys., Inc.*, 711 F. Supp. 2d 402, 408, 416 (E.D. Pa. 2010) (noting that "there is always a risk that the Court or a jury will disagree" that the defendants were liable for Fair Credit Reporting Act violations despite the plaintiff's success at the motion to dismiss stage) (*quoted in Singleton*, 2013 WL 5506027, at *9).

Furthermore, the lack of objections and opt-outs from the class weighs heavily in favor of adequacy. *See In re The Mills Corp. Sec. Litig.*, 265 F.R.D. 246, 257 (E.D. Va. 2009).

The defendant's solvency may be relevant in evaluating the settlement's adequacy if the defendant likely could not satisfy a litigated judgment, "thus making settlement the only means for claimants to recover at all." *Serzone*, 231 F.R.D. at 245. Although Capital One could likely afford to pay a much larger judgment, because the other factors favor adequacy, this factor may be given less weight. *See id.* (*citing Henley v. FMC Corp.*, 207 F. Supp. 2d 489, 494 (S.D. W. Va. 2002)). Accordingly, the Court will find that the settlement is adequate.

C. Litigation Expenses & Attorney's Fees

The Settlement Agreement provides for an attorney's fee award of one-third of the Settlement Fund and for reimbursement of class counsel's costs and litigation expenses. ECF No. 77-2 at 16. Class counsel have moved for reimbursement of $5,504.09 in costs and expenses. *See* ECF No. 90-1 at 22.

1. Attorney's Fees

Under Federal Rule of Civil Procedure 23(h), "the court may award reasonable attorney's fees . . . that are authorized . . . by the parties' agreement." There are two methods commonly used

22

for calculating an attorney's fee award: the lodestar method[20]
and the "percentage of recovery" method. *See The Mills*, 265
F.R.D. at 260. District courts in the Fourth Circuit, and the
majority of courts in other jurisdictions, use the percentage of
recovery method in common fund cases. *See id.*; *Strang v. JHM
Mortgage Sec. Ltd. P'ship*, 890 F. Supp. 499, 502 (E.D. Va.
1995). However, because of the percentage of recovery method's
limitations, courts often employ a lodestar multiplier cross-
check to ensure the reasonableness of the award. *See, e.g.*,
*Domonoske v. Bank of Am., N.A.*, 790 F. Supp. 2d 466, 475 (W.D.
Va. 2011).

---

[20] The lodestar method determines the appropriate fee award by
multiplying the reasonable hourly rate by the number of hours
reasonably expended. *Grissom v. The Mills Corp.*, 549 F.3d 313,
320 (4th Cir. 2008). In applying the lodestar method, Courts
consider the following 12 factors to determine if the award is
reasonable:

> (1) the time and labor expended; (2) the novelty and
> difficulty of the questions raised; (3) the skill
> required to properly perform the legal services
> rendered; (4) the attorney's opportunity costs in
> pressing the instant litigation; (5) the customary fee
> for like work; (6) the attorney's expectations at the
> outset of the litigation; (7) the time limitations
> imposed by the client or circumstances; (8) the amount
> in controversy and the results obtained; (9) the
> experience, reputation and ability of the attorney;
> (10) the undesirability of the case within the legal
> community in which the suit arose; (11) the nature and
> length of the professional relationship between
> attorney and client; and (12) attorney's fees awards
> in similar cases.

*Id.* at 321 (*citing Spell v. McDaniel,* 824 F.2d 1380, 1402
n. 18 (4th Cir. 1987)).

a. Percentage of Recovery method.

The percentage of recovery method awards fees based on a percentage of the recovery of the class, and is set by weighing the following seven factors:

(1) the results obtained for the Class; (2) objections by members of the Class to the settlement terms and/or fees requested by counsel; (3) the quality, skill, and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) public policy; and (7) awards in similar cases.

*The Mills*, 265 F.R.D. at 260-61 (*citing*, *inter alia*, *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 733 (3d Cir. 2001)).

i. Results Obtained / Objections

In the Fourth Circuit, "the most critical factor in calculating a reasonable fee award is the degree of success obtained." *McKnight v. Circuit City Stores, Inc.*, 14 F. App'x 147, 149 (4th Cir. 2001) (internal quotations omitted); *Teague v. Bakker*, 213 F. Supp. 2d 571, 583 (W.D.N.C. 2002). Here, class counsel's efforts have led to the creation of a sizeable Settlement Fund that will compensate more than 2,000 class members. *See* ECF No. 90-1 at 3. Also, class members will receive their settlement proceeds automatically without having to file a claim. *See id.* at 4. In addition to monetary relief, Capital One will also cancel outstanding balances for class members, dismiss pending lawsuits against class members, and contact credit reporting agencies on class members' behalf. *See*

24

*id.* at 2-4. This non-monetary relief would not have been
available outside of settlement, even if the class had prevailed
at trial. *Id.* at 4. Finally, although notice has reached more
than 95% of class members, no one has objected to the settlement
or opted out of the class. ECF No. 87-1 at 3. Accordingly, the
valuable non-monetary and monetary relief obtained through
settlement, and the absence of objections by the class to the
settlement, indicate that class counsel have achieved a superior
result for the class and weighs in favor of their requested
award. *See, e.g.*, *Kay Co. v. Equitable Prod. Co.*, 749 F. Supp.
2d 455, 465 (S.D.W. Va. 2010); *Helmick v. Columbia Gas
Transmission*, CIV.A.2:07-CV-00743, 2010 WL 2671506, at *6
(S.D.W. Va. July 1, 2010) (finding award of one-third of common
fund appropriate, in large part, because of the lack of
objections to the settlement despite successful notice to 94.7%
of the class).

### ii. Quality and Efficiency

As discussed above, class counsel have significant
experience in consumer class action litigation and are
nationally recognized for excellence. *See supra* Section
II.B.2.b.i. Although the litigation has been ongoing for
several years, much of that time was spent litigating the appeal
of the Court's grant of the defendants' motion to dismiss.

Class counsel zealously pursued recovery for the class and litigated efficiently, despite a vigorous defense.

### iii. Complexity and Duration

To evaluate the complexity and duration of the litigation, the amount of motions practice and discovery is considered in addition to the time between filing the complaint and reaching settlement. *Kay Co.*, 749 F. Supp. 2d at 465. "The case is more complex when the applicable laws are new, changing, or unclear." *Id.* (*citing In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124, 139 (S.D.N.Y. 2008)). In the settlement context, courts consider whether negotiations were "hard fought," "complex," or "arduous." *Boyd*, 2014 WL 359567, at *12 (internal quotations omitted).

This litigation has been pending for almost four years, which is fairly long compared to other large class actions. *See Kay Co.*, 749 F. Supp. 2d at 465. Although class counsel lost at the motion to dismiss stage on preemption grounds, they obtained a vacatur on appeal, indicating that the law was unclear and the issues complex. *Muhammad v. Nat'l City Mortgage, Inc.*, CIV.A. 2:07-0423, 2008 WL 5377783, at *8 (S.D.W. Va. Dec. 19, 2008) (finding issues complex, in part, because they involved "application of state consumer protection law, and difficult federal preemption issues"). Also, the parties engaged in some informal discovery, although they did not have discovery

disputes. *See* ECF No. 77-1 at 2. Finally, the parties represent that settlement negotiations were lengthy and hard-fought and required the participation of a Magistrate Judge. *See id.* Accordingly, although the litigation did not involve extensive discovery or motions practice, the uncertainty and difficulty of the issues, length of litigation, and intensity of settlement negotiations favor the requested award.

> iv. Risk of Nonpayment / Public Policy /
> Similar Cases

Class counsel took this case on a contingent fee basis and fronted the costs of litigation. *See* ECF No. 87-4 at 7. Furthermore, the defendants vigorously contested their liability, and the case was not referred for settlement until after the defendants lost on appeal. These factors indicate a relatively high risk of nonpayment. *See The Mills*, 265 F.R.D. at 263.

This high risk of nonpayment also indicates that public policy favors the requested award, *see id.*, because the relevant public policy considerations involve the balancing of "the policy goals of encouraging counsel to pursue meritorious . . . consumer litigation . . . while also protecting against excessive fees," *Domonoske*, 790 F. Supp. 2d at 476 (internal quotations and punctuation omitted) (*citing In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 132 (2d Cir. 2008)).

Although the Court should avoid awarding attorney's fees that overcompensate class counsel, or create a perception of overcompensation, *see In re Wachovia Corp. ERISA Litig.*, 3:09CV262, 2011 WL 5037183, at *6 (W.D.N.C. Oct. 24, 2011), the requested fee award is in-line with those awarded in consumer class actions involving a similar degree of complexity and risk to counsel, *see Muhammad*, 2008 WL 5377783, at *8 (awarding fees of one-third of common fund in case challenging consumer lending practices).[21] Accordingly, these factors also weigh in favor of the requested fee award.

### b. Lodestar Cross-check

When the lodestar method is used only as a cross-check, the "exhaustive scrutiny" normally required by that method is not necessary. *Kay Co.*, 749 F. Supp. 2d at 469 (*citing Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 50 (2d Cir. 2000) ("[W]here used as a mere cross-check . . . the reasonableness of the claimed lodestar can be tested by the court's familiarity with the case.") (internal citations omitted)). Thus, the Court may accept as reasonable class counsel's estimate of the hours they have spent working on the case. *See, e.g., Jones v.*

---

[21] *See also McDaniels*, 2014 WL 556288, at *13 (awarding attorney's fees of one-third of common fund, in part, because the award was "in line with the awards approved by other judges of the United States District Court for the District of Maryland in consumer class actions settled with a common fund").

*Dominion Res. Servs., Inc.*, 601 F. Supp. 2d 756, 766 (S.D.W. Va. 2009).

Class counsel aver that they have spent 650 hours litigating this case, and each attorney bills between $400 and $550 per hour. *See* ECF No. 87-4 at 7. Using the lower billing rate of $400, class counsel's requested award is 3.9 times the lodestar rate. "Courts have generally held that lodestar multipliers falling between 2 and 4.5 demonstrate a reasonable attorney's fee." *Singleton*, 2013 WL 5506027, at *16. Accordingly, the lodestar cross-check confirms that the requested fee award is reasonable. The Court will award class counsel the requested fee award of one-third of the common fund.

2. Costs

Plaintiffs entitled to recover attorney's fees may also recover "reasonable litigation-related expenses as part of their overall award." *Singleton*, 2013 WL 5506027, at *17 (*quoting Kabore v. Anchor Staffing, Inc.*, No. L-10-3204, 2012 WL 5077636, at *10 (D. Md. Oct. 17, 2012) (internal quotations omitted)); Rule 23(h). Such costs include reasonable out-of-pocket expenses that are normally charged by an attorney to a fee-paying client for the provision of legal services. *Singleton*, 2013 WL 5506027, at *17 (*citing Spell,* 852 F.2d at 771).

Class counsel have submitted an affidavit documenting their out-of-pocket costs in conducting this litigation. *See* ECF No.

87-4 at 8. They request reimbursement for costs associated with filings, service of process, copies, courier services, transcripts, and travel. *Id.* These are typical reimbursable costs, *see Singleton*, 2013 WL 5506027, at *17, and the requested reimbursement is reasonable especially considering the length of the litigation. Accordingly, the Court will award class counsel the requested $5,504.09 in costs.

D. Incentive Payment to the Representative Plaintiff

The Settlement Agreement provides for a $10,000 incentive payment to Decohen. ECF No. 77-2 at 22. As part of a class action settlement, "named plaintiffs ... are eligible for reasonable incentive payments." *Stanton v. Boeign Co.,* 327 F.3d 938, 977 (9th Cir. 2003).[22] To determine whether an incentive payment is warranted, the court should consider "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." *Cook,* 142 F.3d at 1016; *see also Singleton*, 2013 WL 5506027, at *18 (approving incentive payment of $2,500 to each named plaintiff because each had devoted considerable time to helping class counsel prepare for the litigation and

---

[22] "Because a named plaintiff is an essential ingredient of any class action, an incentive award is appropriate if it is necessary to induce an individual to participate in the suit." *Cook v. Niedert,* 142 F.3d 1004, 1016 (7th Cir. 1998).

participating in the mediation and undertook some personal risk to further the lawsuit).

At the hearing, class counsel represented that Decohen was involved in the litigation from its inception until settlement. He brought the case to the attention of counsel and was actively involved in all stages of the case. Although he was not present during the settlement mediation, class counsel consulted with him regularly throughout. Also, Decohen insisted on settling the case in a manner that benefitted the whole class. Accordingly, because Decohen substantially participated in the litigation and settlement--and actively advocated for the interests of the class--the Court will award the requested incentive payment of $10,000.[23]

III. Conclusion

For the reasons stated above, the Court will grant Decohen's motions for final approval of the Settlement Agreement, approval of the *cy pres* award, attorney's fees and costs, and an incentive payment to Decohen.

_____
Date

_____
William D. Quarles, Jr.
United States District Judge

---

[23] *See, e.g.*, *Helmick*, 2010 WL 2671506, at *3 (awarding $50,000 incentive payment when representative plaintiff actively participated in the litigation and mediation).